UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JEFFREY A. HASTIE,

                  Plaintiff,   SENT TO CHAMBERS      06 Civ. 1852 (VM) (DF)
                         FOR REVIEW

                                                  FIRST AMENDED COMPLAINT

    - against -                MAY 1 9 2006

                                                   ECF CASE

THE ASSOCIATED PRESS,        U.S.D.C.S.D.N.Y.
                                CASHIERS         PLAINTIFF DEMANDS A
                    Defendant.                     TRIAL BY JURY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Plaintiff Jeffrey A. Hastie ("plaintiff" or "Hastie"), through his attorneys Vladeck,

Waldman, Elias & Engelhard, P.C., complains of defendant the Associated Press ("defendant" or

"AP"), as follows:

NATURE OF THE ACTION

        1.     Plaintiff brings this action to remedy race discrimination in employment

and to remedy retaliation for his opposition to such unlawful employment actions, in violation of

Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); the New York

State Human Rights Law, Executive Law § 296 et seq. (the "Executive Law"); and the

Administrative Code of the City of New York § 8-101 et seq. (the "City Law").

        2.     Plaintiff seeks injunctive and declaratory relief, damages, and other legal

and equitable relief pursuant to Section 1981, the Executive Law, and the City Law.

JURISDICTION AND VENUE

        3.     The Court has jurisdiction over plaintiff's Section 1981 claim under 28

U.S.C. §§ 1331 and 1343(a)(3) and (4).

4.      The Court has supplemental jurisdiction over plaintiff's Executive Law and City Law claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in this District pursuant to 29 U.S.C. § 626(c) and 28 U.S.C. § 1391 because the unlawful practices complained of herein occurred within the Southern District of New York.

6.      Pursuant to § 8-502(c) of the City Law, prior to filing the original Complaint in this matter, plaintiff served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.  A copy of this First Amended Complaint will be served on those entities as well.

7.      Plaintiff will file a charge of discrimination with the United States Equal Opportunity Employment Commission (the "EEOC").  When plaintiff receives a Right to Sue Notice, he will seek to amend the Complaint to add claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII").  The facts set forth are those relevant to that claim as well and therefore, there will be no prejudice to defendants by this procedure.

<u>PARTIES</u>

8.      Plaintiff, an African-American man, was employed by defendant from June 1996 until his employment was involuntarily terminated on or about December 30, 2005.

9.      Defendant AP is an employer within the meaning of the Executive Law and the City Law.

<u>FACTUAL ALLEGATIONS</u>

<u>Background</u>

10.      Plaintiff is an experienced information technology professional with more than ten years of senior management experience.  He received a Bachelor of Science degree from Case Western University and a Master's degree in Business Administration from Columbia University.

11.      AP hired plaintiff in 1996 as Director of Technology Planning.  In 1997, he was promoted to the position of Deputy Director of Technology.  In that position, plaintiff managed a global staff of 690 employees, established AP's new Internet delivery platform, and developed and maintained all operations, disaster recovery, and business continuity standards for information systems.

12.      In 2003 plaintiff was again promoted, this time to Vice President of Services and Technology.  In that position, plaintiff managed more than 700 people and had overarching responsibility for several departments, including Operations, Customer Support, Finance, and Human Resources.  In addition, plaintiff managed the Services and Technology Department's twenty million dollar capital budget and one hundred million dollar operating budget.

13.      Upon information and belief, when plaintiff was Vice President of Services and Technology, he was one of the highest-ranked African-Americans at AP.  Plaintiff received monthly reports to the management committee regarding AP's diversity.  Upon information and belief, the number of African-Americans working at AP is significantly below average compared to similar media companies such as Time Warner, the New York Times, Viacom, Knight Ridder Tribune, and the Washington Post.  The percentages of Hispanic and Asian employees at the company are even worse.

14.    Throughout plaintiff's career at AP, his supervisor was John Reid ("Reid"), Senior Vice President of Services Technology.  Tom Curley ("Curley"), a Caucasian man, became President and Chief Executive Officer of AP in 2003.  Curley appears to be wholly unconcerned with diversity; in his two and one-half years at AP, he has only addressed the company's Diversity Council once.  Of the original fifteen members of the Diversity Council, at least five have either been fired or left the company due to lack of promotional opportunities. Moreover, Curley has never made any statement to AP employees emphasizing a commitment to increasing diversity at AP.

15.    Curley is noticeably uncomfortable with the idea of African-Americans in management positions.  After Curley arrived at AP, he hired an African-American man as Chief Financial Officer of AP who lasted only one year before Curley fired him and replaced him with Ken Dale ("Dale"), a Caucasian man.

16.    Curley's discomfort with African-Americans also affected plaintiff. Plaintiff had been asked by another vice president to present the plan for AP's telecommunication business to a meeting of the revenue committee.  When plaintiff was about to begin his presentation, Curley asked plaintiff, "Why are you here"?  Plaintiff explained that he was at the meeting to make a presentation regarding telecommunications.  In response, Curley stated that he had told Reid that telecommunications should be managed by Tom Brettingen ("Brettingen"), Senior Vice President for Newspaper and New Media Marketing, not by Reid. Curley then told plaintiff, "Well, since you're here, you might as well present."  Brettingen is Caucasian.

17.    Similarly, when plaintiff met with Curley in August 2004 to discuss employee reductions in Services and Technology, Curley asked plaintiff once again, "Why are

you here?" Because the meeting was being held to discuss issues in plaintiff's department, Curley's question was particularly strange.   During a September meeting in which plaintiff represented Services and Technology because Reid was on vacation, Curley asked plaintiff to whom the Customer Support Department reported.  Plaintiff responded that he was responsible for Customer Support, and Curley said "Oh, that's why you're here."

18.     Curley's repeated questioning of plaintiff's presence and role at meetings shows Curley's discomfort with African-American employees in managerial positions and is part of the intentional discrimination plaintiff suffered while at AP.

19.     Moreover, upon information and belief, Curley's negative perceptions of African-Americans, including plaintiff, altered Reid's attitude towards plaintiff.

20.     In spite of Curley's attitude, until late in 2005, plaintiff's career at AP was marked by stellar performance for which he received good performance reviews and praise from his colleagues and supervisors.  In June 2005, Hastie earned a six percent merit increase, which was twice the company's average.  As recently as October 2005, Dale, AP's Chief Financial Officer, sent plaintiff an e-mail message praising his work.

21.     Beginning in 2004, however, plaintiff repeatedly had difficulty getting his management decisions approved by Reid and AP's Human Resources Department.  For example, at the end of 2004, plaintiff told Reid that plaintiff would like to replace a member of plaintiff's team, who is Caucasian, because the employee was ineffective.  Reid disagreed with plaintiff. During the course of 2005, plaintiff conducted additional performance management discussions with the employee in an effort to help the employee succeed, but plaintiff also repeatedly told Reid that the employee was not improving and that plaintiff wanted to fire the employee.  When it was time for the employee's review, plaintiff gave the employee a negative review and told

him that he would not get a merit increase. Reid ignored plaintiff's assessment, and gave the employee a bonus.

22.    Similarly, plaintiff put another Caucasian employee on written warning on October 20, 2005, and attempted to send that employee a final warning letter, but Reid prevented him from doing so.

23.    In the Fall of 2005, plaintiff fired one of the employees on his staff. The customary practice at AP is that when an employee is fired, that employee is escorted from the building and is not allowed to return. On September 15, 2005, however, plaintiff was shocked to discover that the fired employee was wandering the halls by herself. Plaintiff raised the issue with Jessica Bruce ("Bruce"), Vice President of Human Resources. Plaintiff pointed out that allowing the fired employee to remain in the building could have negative consequences for AP and asked why Human Resources had not asked her to leave. Bruce responded with an e-mail message asking whether plaintiff was saying that Human Resources had undermined him. Plaintiff responded by telling Bruce that he was not suggesting that Human Resources had undermined him. Plaintiff explained that it was not helpful to have a terminated employee walking around the office. Bruce's curt response was, "I don't think we need to discuss it further." The employee that plaintiff fired is Caucasian.

24.    Upon information and belief, senior employees at AP who are not African-American have not had their management decisions second-guessed and ignored in the manner that Bruce and Reid ignored plaintiff's decisions. Bruce and Reid's failure to support plaintiff's decisions were elements of AP's intentional discrimination towards plaintiff on the basis of his race.

25.     In addition, plaintiff was made a scapegoat for decisions made by Caucasian employees.  For example, in 2003, the Director of Research and Development proposed that AP use a data warehousing technology company called Teradata as a consultant. The Director of Research and Development had worked for Teradata before arriving at AP. Plaintiff opposed this decision, and told Reid so repeatedly.  Nevertheless, AP gave Teradata a one million dollar purchase order, which Reid authorized because plaintiff did not approve of the decision.

26.     AP fired the Director of Research and Development in July 2004 because she had not produced any results, and Reid decided to try to get out of the Teradata purchase order.  Reid only made that decision after Jerry Hawk ("Hawk"), the Caucasian man who replaced the Director of Research and Development, recommended that Reid do so.

27.     Also in 2004, AP began looking for a new data retrieval company. Teradata introduced AP to Convera, and Reid decided to pursue a licensing agreement with Convera.  Once again, plaintiff told Reid that he did not think the agreement was a good idea, and once again Reid ignored his advice.  The agreement did not work out, and plaintiff was told to renegotiate the fees.  Plaintiff was able to achieve a reduction of $200,000.

28.     In December 2004, Reid and plaintiff met to discuss plaintiff's bonus. Reid initially said that plaintiff would not receive a bonus because of the events surrounding Teradata and Convera.  Plaintiff protested Reid's decision, reminding Reid that he had never supported the decisions to work with either Teradata or Convera.  Reid ultimately gave plaintiff a twenty-five percent bonus.  No one in plaintiff's department received more than a twenty-five percent bonus in 2004.

29.    Reid's attempt to punish plaintiff for decisions that were not attributable to plaintiff was yet another example of AP's intentional discrimination against plaintiff on the basis of his race.

30.    Even though Reid initially attempted to punish plaintiff for decisions that were not his fault, Caucasian employees who in fact made substantial errors were rewarded. For example, a Senior Vice President of Human Resources and a Director of Administrative Services coordinated AP's move to its new headquarters. Plaintiff supervised the technology portion of the move. The technology elements of the move were executed flawlessly: the Services and Technology Department bought and installed over four hundred and fifty new computers; moved about 1,000 employees over three weekends; and duplicated data connections without any major problems. The rest of the move did not go as smoothly, however. The total project was budgeted for sixty-five million dollars, and the amount allotted for technology was nineteen million dollars. Although the technology portion of the move came in at three million dollars under budget, the total project was nearly seventeen million dollars over budget.

31.    In spite of the massive budgetary problems with the move, the Senior Vice President of Human Resources was promoted to head AP's Department of International Services, and the Director of Administrative Services remains at AP. Both are Caucasian.

32.    In October 2005, Reid and plaintiff had a series of conversations in which Reid complained about AP's management team and provided plaintiff with the name of an executive recruiter in case plaintiff wanted to try to leave the company. At no point did Reid state that AP was considering firing plaintiff or was unhappy with plaintiff's performance. At one point plaintiff asked Reid if Reid was hiding something from plaintiff, and Reid would not answer the question.

33.     On November 10, 2005, plaintiff received an e-mail message from Bruce regarding a technology issue that they had discussed earlier in the week.  The issue related to a database that AP had recently created to track company assets such as laptops and cameras. Bruce and Dale wanted to have employees use their employee identification numbers to access the database. Based on his knowledge of computer systems and problems involving privacy and identity theft, plaintiff expressed concern that if employees used their employee identification numbers to access the database, people both inside and outside of AP might be able to use those identification numbers to access other confidential information.

34.     Plaintiff sent an e-mail response answering Bruce's question, and then noticed that a chain of messages was attached to Bruce's message.  When plaintiff read the entire chain, he was surprised to discover an exchange between Bruce and Dale, in which Dale expressed his annoyance at plaintiff's concern by calling plaintiff a "jerk."  Dale then wrote that plaintiff "get[s] in the way of everything."  Bruce responded by agreeing that plaintiff was a "jerk" who is "super passive aggressive."  Bruce also opined, "it's not going to get any better over the next few months while he's a short-termer – or at least supposed to be."

35.     Notably, after referring to plaintiff in a derogatory manner, Bruce admitted that the concern plaintiff had expressed about the technology issue was "interesting."

36.     Plaintiff was shocked by the content of Bruce's message.  Plaintiff was not only shocked by being called a "jerk" by a human resources professional, but by Bruce's reference to him as a "short-termer," which plaintiff did not understand.  Plaintiff then responded to Bruce's message again, acknowledging that he had read the entire chain of messages.

37.     Bruce e-mailed plaintiff and apologized.  Plaintiff did not respond.

38.     On or about Monday, November 14, 2005, plaintiff met with Reid to discuss Bruce and Dale's e-mail messages. Plaintiff told Reid that he did not understand Bruce's reference to him as a "short-termer," as nothing in their prior conversations made him suspect that AP wanted him to leave. Plaintiff also said that his effectiveness at the company had been severely compromised. Reid apologized profusely on behalf of AP, and emphasized that plaintiff was not supposed to see Bruce and Dale's messages. Reid then referred to the conversations that he and plaintiff had in October 2005 about AP's management and plaintiff's possible use of an executive recruiter. Reid claimed that he was trying to give plaintiff a hint that he should think about leaving AP during those conversations. Reid then wondered aloud whether he should have been more direct. Plaintiff was not fired at that meeting.

39.     On or about November 16, 2005, plaintiff sent an e-mail message to Bruce and Reid stating that he thought he was being discriminated against. Plaintiff specifically noted that he was the most senior African-American at AP, and posited, among other things, that the company was making him a scapegoat for missteps that other employees had made.

40.     Bruce responded by e-mail on November 16, 2005, stating, for the first time, that plaintiff was being fired, and that AP's decision was "based on legitimate business reasons." Bruce also denied plaintiff's allegations of race discrimination, stating that "[r]ight now, the Company, for a variety of reasons, does not believe things are working out. That decision had nothing to do with your race." Bruce did not state what any of AP's "reasons" were.

41.     In late November 2005, plaintiff retained counsel. On November 29, 2005, plaintiff's counsel sent a letter to AP stating that plaintiff had claims of race discrimination.

42.     On December 22, 2005, Reid sent plaintiff a letter setting forth plaintiff's alleged deficiencies, none of which had ever been raised before.  Reid went so far as to criticize plaintiff's performance at AP's August 2005 Management Retreat, even though Reid himself had congratulated plaintiff on plaintiff's "really good work" at the retreat.

43.     AP's alleged reasons for firing plaintiff are pretexts for race discrimination and retaliation.  Before plaintiff expressed concern that he was being discriminated against, he had never heard the criticisms outlined in Reid's letter.

44.     On or about March 6, 2006, plaintiff's former position was filled by a Caucasian man.  Plaintiff has more relevant experience and educational background than his replacement.

<u>FIRST CAUSE OF ACTION</u>

<u>Discrimination Under Section 1981</u>

45.     Plaintiff repeats and realleges paragraphs 1-44 above.

46.     By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of his employment on the basis of his race, in violation of Section 1981.

47.     Defendant acted intentionally and with malice and/or reckless indifference to plaintiff's protected rights.

48.     Plaintiff has suffered, is now suffering and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation as a result of defendant's discriminatory practices unless and until this Court grants relief.

237259 v1                                        11

### SECOND CAUSE OF ACTION

#### Retaliation Under Section 1981

49.     Plaintiff repeats and realleges paragraphs 1-48 above.

50.     By the acts and practices described above, defendant retaliated against plaintiff for the exercise of his rights under Section 1981.

51.     Defendant acted intentionally and with malice and/or reckless indifference to plaintiff's protected rights.

52.     Plaintiff has suffered, is now suffering and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation, and damage to his reputation as a result of defendant's retaliatory practices unless and until this Court grants relief.

### THIRD CAUSE OF ACTION

#### Discrimination Under the Executive Law

53.     Plaintiff repeats and realleges paragraph 1-52 above.

54.     By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of her employment on the basis of his race, in violation of the Executive Law.

55.     Plaintiff has suffered, is now suffering and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation, and damage to his reputation as a result of defendant's discriminatory practices unless and until this Court grants relief.

### FOURTH CAUSE OF ACTION

#### Retaliation Under the Executive Law

56.     Plaintiff repeats and realleges paragraphs 1-55 above.

237259 v1

12

57.    By the acts and practices described above, defendant retaliated against plaintiff for the exercise of his rights under the Executive Law.

58.    Plaintiff has suffered, is now suffering and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation, and damage to his reputation as a result of defendant's retaliatory practices unless and until this Court grants relief.

<u>FIFTH CAUSE OF ACTION</u>

<u>Discrimination Under City Law</u>

59.    Plaintiff repeats and realleges paragraphs 1-58 above.

60.    By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of his employment on the basis of his race, in violation of City Law.

61.    Defendant acted intentionally and with malice and/or reckless indifference to plaintiff's protected rights.

62.    Plaintiff has suffered, is now suffering and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation, and damage to his reputation as a result of defendant's discriminatory practices unless and until this Court grants relief.

<u>SIXTH CAUSE OF ACTION</u>

<u>Retaliation Under City Law</u>

63.    Plaintiff repeats and realleges paragraphs 1-62 above.

64.    By the acts and practices described above, defendant retaliated against plaintiff for the exercise of his rights under the City Law.

65.    Defendant acted intentionally and with malice and/or reckless indifference to plaintiff's protected rights.

66.    Plaintiff has suffered, is now suffering and will continue to suffer irreparable injury, monetary damages, mental anguish and humiliation, and damage to his reputation as a result of defendant's retaliatory practices unless and until this Court grants relief.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiff respectfully requests that the Court enter an award:

a.    declaring that the acts and practices complained of herein are in violation of Section 1981, the Executive Law, and the City Law;

b.    enjoining and permanently restraining these violations of Section 1981, the Executive Law, and the City Law;

c.    directing defendant to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff's employment opportunities;

d.    directing defendant to place plaintiff in the position he would have occupied but for defendant's discriminatory and unlawful conduct and making him whole for all earnings and other benefits he would have received but for defendant's discriminatory treatment, including, but not limited to, wages, pension, and other lost benefits;

e.    directing defendant to pay plaintiff compensatory damages for his mental anguish and humiliation;

f.    directing defendant to pay plaintiff punitive damages for its intentional disregard of and/or reckless indifference to plaintiff's statutory rights;

      h.     directing defendant to pay plaintiff's attorneys' fees, costs and disbursements pursuant to Section 1981, the Executive Law, and the City Law;

      i.     directing defendant to pay prejudgment interest; and

      j.     granting such other and further relief as this Court deems necessary and proper.

Dated: New York, New York
      May 19, 2006

                    VLADECK, WALDMAN, ELIAS &
                    ENGELHARD, P.C.

          By:   _Anne Vladeck_

                    Anne C. Vladeck (AV 4857)
                    Michele Host (MH 2557)
                    Attorneys for Plaintiff
                    1501 Broadway, Suite 800
                    New York, New York  10036
                    (212) 403-7300